# EXHIBIT A

# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Johnson, 2012 IL App (1st) 091730**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHAD JOHNSON, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-09-1730 |
| Filed<br>Rehearing denied | March 23, 2012<br>October 18, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant was entitled to a new trial where the trial court failed to ask the prospective jurors whether they understood and accepted all of the *Zehr* principles as required by Supreme Court Rule 431(b), and the evidence was closely balanced and the error "threatened to tip the scales of justice against" defendant. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-7156 (02); the Hon. Diane Cannon, Judge, presiding. |
| Judgment | Reversed and remanded, with instructions. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Levi S. Harris, all of State Appellate Defender's Office, of Chicago, for appellant. |
|---|---|
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Jennifer Streeter, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE J. GORDON delivered the judgment of the court, with opinion. Presiding Justice Epstein and Justice Howse concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant Chad Johnson was charged with involvement in a drive-by shooting in which four people were injured, one of whom later died of his injuries. Following a jury trial, defendant was found guilty of first-degree murder and three counts of aggravated battery, and he was sentenced to 80 years' incarceration. Defendant now appeals. For the reasons that follow, we reverse and remand for a new trial.

¶ 2                                    I. BACKGROUND

¶ 3    On February 1, 2004, Super Bowl Sunday, a drive-by shooting occurred outside Mr. G's Food and Liquor Store in Chicago, Illinois. Christopher Dorbin, Desi Jones, Kentrae Wade, and Carol Holt were all injured by the shots that were fired, and Christopher died of his injuries on March 18, 2004. Defendant, Ricardo Lee, and Oliver Crawford were charged with the shooting. Defendant and Lee shared a severed trial, with defendant's case tried to a jury and Lee's case tried before the bench, while Crawford had a separate trial.

¶ 4    There was no physical evidence linking defendant to the offense. Instead, the State relied upon the eyewitness testimony of Desi and Kentrae, both of whom identified defendant as one of the shooters. Defendant raised an alibi defense, calling his ex-girlfriend, his ex-girlfriend's mother, and his friend to testify that he was in Fulton, Kentucky, on the day of the shooting.

¶ 5    The jurors in this case were drawn from two panels. During *voir dire*, the trial court instructed the first panel of jurors as to the *Zehr* principles as follows:

> "As I indicated, the defendant is presumed innocent of the charges against him. The State has the burden of proving him guilty beyond a reasonable doubt. He is not required to prove his innocence. He may testify; he may not testify, which is his right. If he elects not to testify, is there anybody who would hold that against him?
>
> No response."

-2-

Defense counsel raised no objection to this instruction.

¶ 6        The trial court instructed the second panel of jurors as follows:

> "As I indicated earlier, you were here to decide the guilt or innocence of Chad Johnson only. The defendant, Mr. Johnson, is presumed innocent of the charges against him. The State has the burden of proving him guilty beyond a reasonable doubt. The defendant has a right to testify; he has a right not to testify. If he exercises his right not to testify, is there anybody who would hold that against him?"

One of the prospective jurors indicated that he would hold a lack of testimony against the defendant, whereupon the court subsequently excused him. As with the previous panel, defense counsel raised no objection to the trial court's instruction.

¶ 7        At trial, during opening arguments, counsel for the defendant asserted that the case was one of mistaken identity:

> "Mr. Johnson has been mistakenly identified as being the individual involved in a shooting on February the 1st of 2004. *** When someone is misidentified, it's not necessarily intentional. The person actually believes that they made a correct identification. And that is what can be so dangerous because it can sound so convincing."

¶ 8        Desi testified for the State that he was a member of the Gangster Disciples (GDs) street gang. He said that in 2004, the 57th and Calumet branch of the GDs was at war with the 57th and Wabash branch of the GDs over turf. He, Christopher, and Kentrae were all members of the 57th and Calumet GDs, and Mr. G's was located in territory controlled by that branch. Defendant and Crawford were members of the 57th and Wabash GDs.

¶ 9        Desi testified that around 11:50 a.m. on February 1, 2004, Super Bowl morning, he went to Mr. G's to get supplies. He saw Kentrae and Christopher outside the store and began speaking with Christopher. While they were conversing, Desi noticed a purple Dodge driving the wrong way down Calumet, a one-way street. He also noticed that the windows of the car were down although it was very cold outside. The car came to a stop outside Mr. G's. Desi stated that he recognized defendant sitting in the front passenger seat and Crawford sitting in the back. He then saw defendant and Crawford both pull out automatic guns. Desi turned to run, but he was shot three times before the car sped away.

¶ 10       During cross-examination, defense counsel questioned Desi about various alleged inconsistencies between his trial testimony and prior statements that he had made about events on the day of the shooting. As noted, it was Desi's testimony at trial that when he first saw the car, it was on Calumet. Defense counsel asked Desi if he recalled giving grand jury testimony that he first saw the car on 58th Street between Calumet and Prairie. Desi replied that he did recall giving such testimony, but he denied any inconsistency, saying, "The same thing you read is the same thing I just said. It's just probably in a different way."

¶ 11       Defense counsel next asked Desi whether he had entered Mr. G's to purchase items and then exited the store before the shooting occurred. Desi stated that he could not remember. Defense counsel asked him if he recalled testifying before the grand jury that, on the day of the shooting, he went into Mr. G's, purchased Super Bowl supplies, and then exited the store and started speaking with Christopher. Desi stated that, yes, he recalled giving such testimony. Defense counsel then asked him if he recalled subsequently testifying on

September 10, 2007, that he did not have an opportunity to enter Mr. G's to purchase supplies before the shooting occurred.[1] Desi replied, "I had got that part mixed up, sir, I'm sorry."

¶ 12      Defense counsel also asked Desi whether he was inside the store with Christopher at any time. Desi stated that he was not. Defense counsel then asked Desi whether he remembered telling Detective Williams, or any detective, on February 1, 2004, that he exited Mr. G's with Christopher. Desi said that he could not recall any such conversation.

¶ 13      Finally, defense counsel asked Desi whether the car had stopped when the people inside began shooting. Desi replied that, yes, it had. Defense counsel then referred Desi to a handwritten statement which he signed on March 23, 2004, after speaking with Detective Michael O'Donnell, in which Desi stated that "they both started shooting towards him and Christopher as the car pulled by." Desi acknowledged signing the statement but said, "They didn't take that down right. I didn't say the car pulled by. I say when the car stopped."

¶ 14      On redirect examination, over defense counsel's objection, counsel for the State elicited testimony from Desi that, in his statement to Detective O'Donnell on March 23, 2004, he made the following statements consistent with his trial testimony: On the day of the shooting, Desi saw a car with its front passenger and rear windows down, which he thought was strange because of the cold. He looked inside and saw defendant in the front passenger seat and Crawford in the back seat. He saw both of them pull out guns and fire before he was able to duck.

¶ 15      Kentrae, the next witness for the State, testified that he was a member of the 57th and Calumet GDs, which, in 2004, had been at war with the 57th and Wabash GDs for approximately the past five years. On February 1, 2004, shortly before noon, he was in front of Mr. G's with Christopher, Desi, and Carol. Christopher said, "On this car with these windows down," which, in street parlance, constituted a request to watch the car. Kentrae looked and saw a blue, four-door sedan. It struck him as unusual that the windows were down because it was extremely cold. He stated that he saw defendant sitting in the front passenger seat and Crawford in the back. Both were 57th and Wabash GDs whom he had known for about four years. He also got a glance at the driver, who reminded him of Lee.

¶ 16      Kentrae stated that the car opened fire. He ran back into Mr. G's but was shot before he could get inside. Subsequently, the police arrived on the scene, and Kentrae was taken to the hospital for treatment.

¶ 17      During cross-examination, Kentrae stated that he spoke with an officer in the store after he was shot, but he did not identify any of the shooters at that time. "I didn't identify nobody until I was brought to the police station," he said.

¶ 18      Kentrae also stated during cross-examination that, later on the day of the shooting, while he was at the hospital, he spoke with two detectives. The following exchange then occurred:

       "DEFENSE COUNSEL: And you told the detectives that you saw a black male with a gun in the front window?

---

[1]Defense counsel did not disclose what occasioned such former testimony.

PROSECUTOR: Objection. That's not impeaching.

THE COURT: Sustained.

DEFENSE COUNSEL: Sir, you never told the detectives when they interviewed you at the hospital that you saw [defendant] in the passenger seat?

KENTRAE: I don't remember telling them nothing besides it was a blue car because I was in pain at the time.

\*\*\*

Q. And, sir, you also never told the detectives that you saw [defendant] with a gun on–at the time of the shooting?

A. I only recall telling them officers that came to the hospital that it was a blue car, a four-door blue car."

¶ 19    The State also called two other occurrence witnesses, Carol Holt and Stacey Murray. Carol testified that around noon on February 1, 2004, she went to Mr. G's. There were approximately five to seven neighborhood guys hanging around outside. After making her purchases and exiting the store, she heard a car "screeching down the street." Carol stated that the car hit the brakes right in front of the store. The passenger-side front window was open, and she saw the passenger in front pull out a gun. She said that everyone was screaming and running. She was shot as she was attempting to run back into the store. She testified that she was unable to identify any of the people inside the car.

¶ 20    Stacey Murray testified that, like Desi and Kentrae, he was a member of the 57th and Calumet GDs. On February 1, 2004, around 11:50 a.m., he was driving to Mr. G's. When he was approximately a block away, he heard gunshots. After that, he saw a blue Dodge coming quickly toward him. It passed by him on the driver's side, and he saw three people in the car. He testified that Lee was the driver, and Crawford was in the back of the car, but he was unable to identify the third person in the car. Stacey said that he proceeded to Mr. G's, saw that people had been shot, and then called the police.

¶ 21    Vanessa Muhammad, a patrol officer for the Chicago police department, testified for the State that on February 1, 2004, she was assigned to the scene of the shooting to handle the preliminary investigation, interviewing witnesses to get information that might assist in the investigation. She testified that the victims named the defendant, Crawford, and Lee as the people in the car. During cross-examination, she stated that Christopher identified Crawford and Lee, and Kentrae identified Crawford, but neither of them identified the defendant. On redirect, over objection by the defense, counsel for the State asked, "[W]hile you were on the scene within minutes, you had [defendant] as a named offender in this matter?" and she replied, "Yes, we did."

¶ 22    After the State rested, the defense called three witnesses to establish an alibi defense. The first of those witnesses was Joyce Williams. Joyce stated that on February 1, 2004, she was living in Fulton, Kentucky, with her parents. She said that she dated the defendant from the winter of 2003 until 2006, and, to the best of her knowledge, defendant never left the Fulton, Kentucky, area during that time.

¶ 23    Joyce testified that on February 1, 2004, at approximately 10:30 or 11 a.m., she and her

mother were preparing to leave the house to go shopping at a mall in Paducah. At that time, she met defendant briefly in the living room of her house. He gave her $80, she thanked him, and then she and her mother left the house. On cross-examination, Joyce stated that it was not unusual for her to go to the mall with her mother, but she remembered that particular occasion because she was going to be presented with a "teacher of the year" award the next day, and her picture was going to be in the newspaper, so she wanted to purchase new shoes.

¶ 24    Counsel for the State asked Joyce to elaborate on when in 2006 she stopped dating defendant. Joyce stated that defendant was incarcerated in Henning, Tennessee, and she wrote him a letter informing him that she was breaking up with him. The following colloquy then occurred:

"PROSECUTOR: Now, when he was incarcerated in Tennessee, you found out I'm sure–

DEFENSE COUNSEL: Judge, we would object.

THE COURT: Overruled.

PROSECUTOR: You found out, I'm sure, that he was being charged with a murder up here in Chicago, right?

JOYCE: No.

Q. No?

A. No.

Q. You didn't know that he was facing a murder charge in Chicago?

A. I thought drugs related 'cause he left Henning. The last time I saw him was August '06 in Henning, Tennessee.

Q. And he was incarcerated at that time?

A. Yes, then. And word was I heard he had left and came here. I assumed it was drugs."

She stated that she did not find out that defendant had been charged with murder until the fall of 2006, and she had never been informed that the murder at issue took place on February 1, 2004. She said that, if she had known that he was being charged with a murder that occurred on February 1, 2004, she would have notified the authorities earlier to inform them that he was innocent.

¶ 25    The next witness for the defense was Ora Russell, Joyce's mother. She said that on February 1, 2004, Super Bowl Sunday, she cooked food for her grandchildren and then went shopping with Joyce at a mall in Paducah. She testified that she saw defendant on that morning giving money to Joyce. She further stated that the 2004 Super Bowl stood out in her memory because her grandchildren were visiting and because people were talking about having a block party, although no block party was actually held.

¶ 26    Gloria Taylor also testified for the defense. She stated that she was a friend of defendant. In early 2004, she was employed at the Spot Bar and Grill in Fulton, Kentucky. On February 1, 2004, there was a Super Bowl party at the Spot–in fact, the only formal Super Bowl party that was ever held at the Spot–and she was working as a bartender. She testified that when

she arrived at the Spot on that day, at around 4:30 p.m., she saw defendant in the parking lot. She stated that she also saw him inside the Spot during the game. Although she was not constantly watching him, she said that she knew he was present for the entire game, because she saw him after the game exchanging money with other patrons who had been betting on the game.

¶ 27      The defense next called Kimyona Taylor (no apparent relation to Gloria Taylor), who was employed as an investigator in defense counsel's office. Taylor stated that she and her partner, Patricia Gutierrez, were assigned to speak with witnesses in the area of Fulton, Kentucky, and Union City, Tennessee. They made their first visit to the area in April 2008. Taylor testified that it took them approximately seven hours to drive to Fulton from Chicago even though, while she was driving, she sometimes went over the speed limit.

¶ 28      On cross-examination, counsel for the State questioned Taylor about her investigation. Taylor stated that during their first visit to Fulton, she and Gutierrez spoke with approximately seven or eight people, including Joyce and her parents. She told the interviewees that she and Gutierrez were from Chicago, that they had been sent by defendant's attorney, and that they needed to know whether the interviewees knew the defendant and whether they saw him on February 1, 2004. The following exchange then occurred:

> "PROSECUTOR: When you told these people that you were interviewing that you were working for Mr. Johnson's lawyers, certainly someone asked you was he in any trouble?
>
> TAYLOR: No, they actually already knew that he was in trouble.
>
> Q. They already knew?
>
> A. Yes.
>
> Q. Were they able to tell you what kind of trouble he was in?
>
> A. Yes.
>
> Q. What did they say?
>
> A. They say he was incarcerated on–
>
> DEFENSE COUNSEL: Object.
>
> THE COURT: Overruled.
>
> PROSECUTOR: You can finish, ma'am.
>
> A. He was incarcerated on a drug charge.
>
> Q. Did you correct them?
>
> A. No, I did not."

¶ 29      Taylor further stated during cross-examination that she did not take any notes of her interviews. She testified that she did not need to take notes because she could remember what each individual had told her.

¶ 30      On redirect examination, counsel for the defense presented, as an exhibit, a document prepared by Taylor's partner Gutierrez. Taylor testified that it was a report written by Gutierrez listing the names of the witnesses with whom they spoke and stating that each such

-7-

witness confirmed the alibi of the defendant. The following colloquy then occurred:

"PROSECUTOR: Objection.

THE COURT: Wait a minute. You just said you didn't write a report. Your partner wrote a report?

TAYLOR: No, I did not say I did not write a report. He asked me if I had taken notes.

THE COURT: Did you write a report of what the witnesses said?

A. No, I didn't specifically, me, no, I did not write a report.

THE COURT: You did write a report?

A. Specifically, no, I did not–

THE COURT: Wait a minute. Ma'am, listen to my question. Did you write a report?

A. No, I did not.

THE COURT: Did your partner write a report?

A. Yes, she did.

THE COURT: Is that the report there?

A. This is the report that my partner wrote.

THE COURT: That's it?

A. Yes.

THE COURT: The list of the witnesses?

A. Yes.

THE COURT: And it says they confirm an alibi? Is that it? You call that a report?

DEFENSE COUNSEL: Judge–

THE COURT: Wait a minute. Ladies and gentlemen of the jury, step out.

THE DEPUTY SHERIFF: All rise for the jury, please.

(Whereupon, the following proceedings were had outside the presence and hearing of the jury:)

THE COURT: Please be seated. The jury is not in the room. You're working for the Cook County Public Defender's Office?

A. Yes.

THE COURT: What is your salary, ma'am?

A. I think right now it's forty-seven thousand.

THE COURT: You make forty-seven thousand dollars a year. How much did you charge the Cook County Public Defender's Office for your trip for this alibi? What did you get paid every night?

A. My regular salary, just my regular salary.

THE COURT: You had to pay for your own hotel room?

A. No.

THE COURT: Okay. Do you have to pay for your gas?

-8-

A. No.

THE COURT: How have [*sic*] did you get for food every day?

A. I think it was twenty-six dollars.

THE COURT: Okay. And you didn't write a report with one of your interviews and your partner did not write a report with one of your interviews?

A. No.

THE COURT: Okay. You can take this–if you call this a report. It says, 'Cook County Office of the Public Defender Reply to Investigation Request. Requested by Marc Stahl. Date of report: 4/29/08. Per your request, the following is submitted: R I [*sic*], an investigator, Kimyona Taylor traveled to Mayfield, Kentucky and Fulton, Kentucky to locate and interview several witnesses on your request. The following individuals support Chad Johnson's alibi.' And there's seven names. End of report. This is not going into evidence. You can ask her any questions you want.

DEFENSE COUNSEL: Judge, at this time we would move for a mistrial. The Court was yelling at my witness.

THE COURT: I was not yelling. She wouldn't–refused to answer the question. *** Request for a mistrial is respectfully denied. Pick up that piece of paper. And how you can call that a report, Mr. Stahl, with a straight face, and how a Cook County Public Defender employee can call that a report is beyond me. That borders on perjury for both of you, and you know it. And I want this transcript to go to the County Board."

¶ 31    The final witnesses for the defense were detectives from the Chicago police department called for purposes of impeaching the State's eyewitnesses. The first, Detective William Proctor, stated that on February İ, 2004, he interviewed Kentrae at the hospital. Counsel for defendant then attempted to elicit testimony regarding Kentrae's statements during that interview.

"DEFENSE COUNSEL: Did he describe the shooter in the front window, front passenger window of the car?

PROSECUTOR: Objection, not impeaching.

THE COURT: That will be sustained.

DEFENSE COUNSEL: I think–

THE COURT: Sustained.

DEFENSE COUNSEL: Did he describe the sequence of events about what happened out there when he was shot?

THE COURT: That will be sustained. Ladies and gentlemen, this testimony is not admissible, as counsel knows. So that's why I'm sustaining it.

DEFENSE COUNSEL: Did–

THE COURT: Counsel, hearsay is not admissible. *** Any conversations with Kentrae Wade and this detective are inadmissible at this point. If you have any other questions about the rest of his investigation, you can certainly go into that.

DEFENSE COUNSEL: Judge, all of our witnesses today are impeachment witnesses.

Is the Court's ruling we're not allowed to impeach based on the testimony?

THE COURT: This is not impeachment, ladies and gentlemen. You'll hopefully see what impeachment is, if it comes to that.

\*\*\*

DEFENSE COUNSEL: Did Kentrae Wade tell you–

THE COURT: It will be sustained. Counsel, any statements that Kentrae Wade made to this detective–as you stated, you are aware of hearsay–are inadmissible. So please move on to something else."

¶ 32    Detective Proctor then testified that, after speaking with Kentrae, he did not make any attempts to investigate or look for a person named Chad.

¶ 33    Detective Karen Williams testified that on February 1, 2004, she spoke with Desi. According to her, Desi stated that he was leaving the store when the shooting occurred, but he did not say that he was leaving together with Christopher. On cross-examination, over defense counsel's objection, Detective Williams testified that Desi also gave her the names of defendant and Crawford and told her that they both had guns.

¶ 34    During closing argument, defense counsel reiterated his mistaken identity argument, stating:

"Now, we're not saying this is some kind of lie also. Just to be clear, this is a good faith identification on the part of these witnesses. They honestly think, they truly think in their minds that they saw Chad Johnson. But when you look at the objective facts about their opportunity to view and the things they said before and how they contradict what they're saying today or what they said over the last few days, you'll see that this is a misidentification."

In support of this theory, defense counsel reviewed the inconsistencies between Desi's trial testimony and his prior statements and concluded, "And that just shows you that memory is not a videotape, and things change, and sometimes you actually have permanent memories of things that are different than they actually happen."

¶ 35    The jury found defendant guilty of the first-degree murder of Christopher and the aggravated battery of Desi, Kentrae, and Carol. Defendant now appeals.

¶ 36                            II. ANALYSIS

¶ 37    On appeal, defendant raises five contentions of error. First, he contends that the trial court failed to ask prospective jurors whether they understood and accepted all of the *Zehr* principles as required under Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). Second, he contends that the trial court improperly allowed testimony that defendant was incarcerated in Tennessee for an unrelated drug conviction. Third, he contends that the trial court erred by allowing the State to ask Desi and Detective Karen Williams about Desi's prior consistent statements, thus improperly bolstering Desi's credibility. Fourth, he contends that the trial court improperly prevented defendant from impeaching Kentrae with his prior inconsistent statements and from perfecting that impeachment while questioning Detective William Proctor. Finally, he contends that the trial judge improperly displayed hostility toward

defense counsel and toward defense witness Kimyona Taylor in front of the jury. For all these reasons, defendant contends that his conviction should be reversed and the cause remanded for a new trial.

¶ 38                 A. Claimed Lack of Compliance With Rule 431(b)

¶ 39       Defendant's first contention is that he is entitled to a new trial because the trial court failed to comply with Rule 431(b) during *voir dire*. The State does not contest the proposition that the trial court failed to strictly comply with the requirements of Rule 431(b). However, the State argues that defendant has forfeited this argument by failing to raise a contemporaneous objection and, in any event, the trial court's error did not satisfy the prerequisites for plain error so as to survive forfeiture.

¶ 40       Rule 431(b) provides, in its entirety:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

>       The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).          ·

These principles of law have become known as the *Zehr* principles, after the leading case of *People v. Zehr*, 103 Ill. 2d 472, 477-78 (1984), in which our supreme court held that refusal to ask questions on *voir dire* concerning these principles was reversible error.

¶ 41       Under Rule 431, it is insufficient for a trial court to merely instruct the jurors on these principles and then issue a general admonition for them to "follow the law." *People v. Blair*, 395 Ill. App. 3d 465, 477-78 (2009); see Ill. S. Ct. R. 431, Committee Comments (trial court may not simply give "a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law"). Rather, "the rule requires an opportunity for a response from each prospective juror on his or her understanding and acceptance of those principles." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).

¶ 42       In this case, during *voir dire*, the trial court instructed the first panel of prospective jurors about each of the four *Zehr* principles, but it only asked them whether they accepted the fourth principle, regarding a defendant's right to testify. It did not give them an opportunity to respond to the other three principles. Moreover, with regard to the second panel of prospective jurors, the trial court only instructed them as to the first, second, and fourth principles, omitting the third principle, that the defendant is not required to offer any evidence on his behalf. In addition, the court only gave them an opportunity to respond to the fourth principle. Thus, it is plain from the record that the trial court did not fully comply with the strictures of Rule 431(b).

-11-

¶ 43      As noted, the State argues that the trial court's error does not warrant reversal because defendant forfeited this issue by failing to raise contemporaneous objections to the trial court's instructions. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (contemporaneous objection required to preserve issue for review). Defendant, however, contends that we should review the trial court's action under the plain error doctrine. We agree.

¶ 44      Under the plain error doctrine, we may consider unpreserved error where:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

Our supreme court has held that lack of compliance with Rule 431(b) is subject to plain error analysis. *Thompson*, 238 Ill. 2d at 611-13 (rejecting defendant's argument that failure to comply with Rule 431(b) is a structural error requiring automatic reversal). "In plain-error review, the burden of persuasion rests with the defendant." *Id.* at 613.

¶ 45      In this case, defendant seeks relief under the first prong of plain error review, arguing that the error committed by the trial court mandates reversal because of the closeness of the evidence in this case. The State, on the other hand, while conceding that error occurred, argues that reversal is not warranted because the evidence of defendant's guilt was overwhelming. We disagree with the State that the evidence against defendant was overwhelming.

¶ 46      Neither side offered any physical evidence as to defendant's whereabouts on February 1, 2004. Rather, the case hinged on eyewitness testimony presented by the State in opposition to the alibi witnesses presented by the defendant. Both the testimony of the State's witnesses as well as the testimony of the defense's alibi witnesses are impeachable. The State's identification of defendant came from only two witnesses, Desi and Kentrae, both of whom were gang rivals of the defendant. Additionally, Kentrae's identification of the defendant was arguably suspect in that he did not identify defendant on the day of the shooting, despite having known him for four years, but only subsequently told detectives that he saw defendant as one of the shooters in the car. None of the State's other witnesses were able to testify that they saw defendant at the scene. Although Carol and Stacey also testified for the State as occurrence witnesses, Carol stated at trial that she was unable to identify any of the people in the car, while Stacey identified Lee and Crawford but was unable to identify the third man in the car.

¶ 47      Thus, the State's only testimony implicating defendant in the shooting comes from witnesses who could reasonably have had a motive to fabricate evidence against the defendant, since they came from a branch of a gang that, at the time of the shooting, was at war with the branch of the gang of which defendant was a member. Furthermore, one of those witnesses failed to offer that identification when first questioned about it. However, the defense's alibi witnesses are likewise impeachable, since all of them apparently had positive connections with the defendant and therefore might have had a motive to fabricate

testimony in his favor. This would include his ex-girlfriend Joyce, his ex-girlfriend's mother Ora, and his friend Gloria, who testified that they saw him in Fulton, Kentucky, on the day of the shooting, February 1, 2004, Super Bowl Sunday. The State correctly points out that it was not until over four years after the date of the shooting that defense investigator Kimyona Taylor traveled to Fulton, Kentucky, to ask these witnesses about defendant's whereabouts on February 1, 2004, so as to establish defendant's alibi. However, all three witnesses gave reasons at trial for finding that particular Super Bowl Sunday to be particularly memorable. Joyce stated that the defendant gave her money to purchase shoes that she wanted because she was going to have her picture taken as part of a "teacher of the year" award ceremony on the following day. Ora stated that she remembered people's plans to hold a block party on that day. Gloria, who stated that she saw defendant while bartending during a Super Bowl party at the Spot, said that it was the only formal Super Bowl party held at the Spot. Thus, the relative credibility of the State's identification witnesses over the reliability of the defendant's alibi witnesses is by no means obvious or apparent.

¶ 48      Accordingly, our review of this conflicting testimony convinces us that the evidence in this case was closely balanced, such that the trial court's error would have "threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" (*Piatkowski*, 225 Ill. 2d at 565). See *People v. Naylor*, 229 Ill. 2d 584, 608 (2008) (case was closely balanced where "[t]he evidence boiled down to the testimony of the two police officers against that of defendant" and no additional evidence was introduced to contradict or corroborate either version of events). In this regard, the instant case is analogous to *People v. Vesey*, 2011 IL App (3d) 090570, ¶ 23, in which the appellate court reversed defendant's conviction due to the trial court's failure to strictly comply with Rule 431(b). In that case, the trial court did not ask any member of the jury whether he or she understood and accepted that the defendant's refusal to testify could not be held against her, and the trial court also failed to ask 4 out of the 12 jurors whether they accepted the presumption of innocence or the State's burden of proof. *Id.* ¶ 16. In reviewing the trial court's actions under the first prong of plain error analysis, the *Vesey* court found the evidence at trial to have been closely balanced, since the trial largely came down to the word of the defendant versus the word of a correctional officer, and the verdict was decided by whom the jury found more credible. *Id.* ¶ 17. Thus, since the defendant had proved that an error occurred and that the evidence was closely balanced, the *Vesey* court held that prejudice was presumed and reversal was therefore required. *Id.* ¶ 23. In reaching this decision, the *Vesey* court cited to our supreme court's decision in *People v. Herron*, 215 Ill. 2d 167, 193 (2005), in which the court held that the trial court's error in a jury instruction mandated reversal under the first prong of plain error review where the evidence was closely balanced:

> "The defendant need not prove that the error in the instruction actually misled the jury. If the defendant carries the burden of persuasion and convinces a reviewing court that there was error and that the evidence was closely balanced, the case is not cloaked with a presumption of prejudice. The error is actually prejudicial, not presumptively prejudicial. We deal with probabilities, not certainties; we deal with risks and threats to the defendant's rights. When there is error in a close case, we choose to err on the side of fairness, so as not to convict an innocent person." *Herron*, 215 Ill. 2d at 193.

See also *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007) (defendant was entitled to new trial under the first prong of plain error review upon showing that the trial court erred and that the evidence against him was closely balanced).

¶ 49    Relying upon the analysis in *Herron*, the *Vesey* court stated:

"[W]e hold that the trial court erred by failing to comply with the requirements of Rule 431(b). Although the error in this case was minimal, there is no *de minimis* exception to the first prong of the plain error test. [Citation.] Moreover, we find that the evidence in this case was closely balanced. Accordingly, the trial court's clear and obvious error prejudiced the defendant. Therefore, we do not need to reach the second prong of the plain error test, and we reverse and remand for a new trial." Vesey, 2011 IL App (3d) 090570, ¶ 23.

¶ 50    Similarly, in *People v. Belknap*, 396 Ill. App. 3d 183, 207 (2009), the court held that because the evidence was closely balanced, the trial court's failure to strictly comply with Rule 431(b) constituted plain error requiring reversal. In that case, the trial court informed prospective jurors of the principles set forth in Rule 431(b) but did not inquire as to whether they understood and accepted those principles. *Id.* at 206. In reversing defendant's conviction, the *Belknap* court cited *Herron* for the proposition that the first prong of the plain error doctrine considers unpreserved error where the evidence is close, regardless of the seriousness of the error. *Id.* at 207. Thus, the court stated:

"[D]espite the fact that the Rule 431(b) factors were covered just not in the proper manner, we cannot simply ignore this error as a *de minimus* exception to the first prong of the plain error rule. [Citation.] Thus, we conclude that the court's error in this case prejudiced the defendant, as the evidence against him was closely balanced. We therefore reverse the defendant's conviction and remand for a new trial." *Id.* at 207.

¶ 51    Likewise, in the instant case, because the trial court erred in failing to properly instruct the jurors pursuant to Rule 431(b), and because the evidence was closely balanced in that the verdict hinged upon the question of whether the State's eyewitnesses or the defendant's alibi witnesses were more credible, defendant's conviction must be reversed and the case remanded for a new trial. This is particularly true in light of the additional errors complained of by defendant on appeal, as shall be discussed in detail below.

¶ 52                    B. Testimony Regarding Defendant's Incarceration
                          for an Unrelated Drug Offense

¶ 53    Although we have already found reversible error in this case, we will consider the other issues raised by the defendant that are likely to arise again upon remand. Defendant contends that the trial court, over defendant's objection, improperly allowed prejudicial and irrelevant testimony that he was incarcerated in Tennessee for an unrelated drug offense. Joyce, Gloria, and Kimyona Taylor all testified during cross-examination as to his incarceration. Joyce stated that defendant was facing "drug charges" in Tennessee, and when she heard that he had been brought to Chicago, she was not aware that he had been charged with murder but "thought it was drugs." Gloria stated that her cousin Tiffany had visited defendant while he was incarcerated in Tennessee, although she did not state the nature of his conviction.

-14-

Finally, Kimyona Taylor testified that, when she interviewed people about defendant, "they actually already knew that he was in trouble. *** He was incarcerated on a drug charge."

¶ 54　　Defendant argues, and we agree, that his conviction on drug charges in Tennessee was unrelated to the crime at hand. Thus, testimony regarding that conviction would have no admissible bearing upon his guilt or innocence in the present crime other than to promote jury bias. See *People v. Robinson*, 167 Ill. 2d 53, 62 (1995) (other-crimes evidence is inadmissible where its sole relevance would be to establish defendant's propensity to commit crimes).

¶ 55　　Indeed, the State does not contend that these comments relating to defendant's drug conviction were relevant for any proper purpose. Rather, the State argues that defendant was not prejudiced by these comments because "[t]he evidence adduced at trial amply supports defendant's conviction." However, as has been discussed at length above, the evidence at trial was closely balanced. Under such circumstances, we cannot rule out the likelihood that evidence that defendant had been incarcerated for a drug-related offense in Tennessee may have unduly influenced the jury. See *People v. Lindgren*, 79 Ill. 2d 129, 141 (1980) (admission of other-crimes evidence warranted reversal of defendant's conviction where there were "evidentiary ambiguities" in the case such that a fair-minded jury could have voted for acquittal).

¶ 56　　　　　　　C. Testimony Regarding Desi's Prior Consistent Statements

¶ 57　　Defendant next contends that the trial court improperly allowed the prosecution to bolster Desi's credibility by allowing Desi and Detective Williams to testify about prior consistent statements that Desi made in which he identified defendant as one of the shooters. The State argues that the trial court was within the latitude of its discretion in allowing the challenged testimony. See *People v. Ward*, 101 Ill. 2d 443, 455-56 (1984) (admissibility of evidence reviewed on an abuse of discretion standard).

¶ 58　　During cross-examination of Desi, defense counsel questioned Desi's credibility by attempting to impeach him with his prior inconsistent statements as to certain details of the events occurring prior to the shooting. In particular, during trial, Desi stated that he first saw the car on Calumet, while in his grand jury testimony, he stated that he first saw it on 58th Street. Additionally, Desi could not remember during trial whether he had entered Mr. G's to purchase items before the shooting occurred, but he had previously testified on one occasion that he had entered Mr. G's, while testifying on a subsequent occasion that he had not yet entered Mr. G's. Finally, during trial, Desi stated that the car stopped before the people inside began shooting, but in his March 23, 2004, statement to Detective O'Donnell, he said that the people inside began shooting "as the car pulled by."

¶ 59　　During redirect examination, counsel for the State then attempted to bolster Desi's credibility by eliciting testimony as to his prior consistent statements. Most pertinently, Desi was permitted to testify, over objection, that in a written statement that he gave to Detective O'Donnell on March 24, 2004, he stated that when he saw the car approaching, he noted that the front passenger and rear windows were down, which he thought was strange because it was cold. When the car drew close, he saw defendant in the front passenger seat and

-15-

Crawford in the back seat, and as soon as he saw their faces, he saw both of them pull out guns. Likewise, Officer Williams was allowed to testify, over objection, that she spoke with Desi on the day of the shooting, and he told her that he saw both defendant and Crawford in the car with guns.

¶ 60    The general rule is that prior consistent statements of a witness are inadmissible for the purpose of corroborating the trial testimony of the witness, because they serve to unfairly enhance the credibility of the witness. *People v. Terry*, 312 Ill. App. 3d 984, 995 (2000); *People v. Heard*, 187 Ill. 2d 36, 70 (1999). The reason behind this rule has been explained as follows: "The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them. People tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve." *People v. Smith*, 139 Ill. App. 3d 21, 33 (1985) (erroneous admission of prior consistent statement was reversible error). A prior consistent statement is not rendered admissible merely because the testimony of a witness has been discredited or opposing counsel has sought to challenge his credibility. *People v. DePoy*, 40 Ill. 2d 433, 438-39 (1968) (where defense counsel impeached State witness with his prior inconsistent statement, the State was not allowed to rehabilitate the witness on redirect by eliciting testimony about his prior consistent statement); *People v. McWhite*, 399 Ill. App. 3d 637, 641 (2010).

¶ 61    The State contends that it was properly allowed to introduce testimony regarding Desi's prior statement in order to rebut the defense's implication that Desi recently fabricated his testimony.[2] The State cites the exception to the rule against prior consistent statements in which such statements may be introduced to rebut an allegation that the witness was motivated to testify falsely, or otherwise to rebut an allegation of recent fabrication. *People v. House*, 377 Ill. App. 3d 9, 19 (2007). To qualify for this exception, the prior consistent statement must have been made prior to the existence of the alleged motive to testify falsely or the alleged fabrication. *Id.* at 19; *Heard*, 187 Ill. 2d at 70.

¶ 62    In this case, the exception does not apply, because defense counsel did not argue that Desi had a motive to falsely implicate defendant in the crime. See *McWhite*, 399 Ill. App. 3d at 641 (where defense impeached testifying officer with statements previously made in case report, but did not raise any charge of fabrication or motive to lie, it was reversible error for the State to be permitted to introduce evidence of officer's prior consistent statements). Although the State, in its direct examination of Desi, elicited testimony that Desi and the defendant belonged to rival factions of the same gang, defense counsel did not reference the animosity between their gang factions during cross-examination of Desi or, for that matter,

---

[2]We note that neither side argues the admissibility of Desi's prior identification of defendant under section 115-12 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-12 (West 2008) (governing admissibility of certain prior identifications)), and so we need not consider such argument. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). Moreover, in any event, even if the prior identification itself were admissible under such section, the admissibility of the remainder of Desi's prior consistent statement would arguably still be at issue (*cf. People v. Palmer*, 188 Ill. App. 3d 414, 423 (1989)), so our analysis in this regard would remain unchanged.

in opening and closing arguments. Nor did defense counsel otherwise argue that Desi recently fabricated his testimony. Rather, it was the defense's consistent position that Desi's identification of the defendant was honest but mistaken. Thus, during opening arguments, the defense stated, "When someone is misidentified, it's not necessarily intentional. The person actually believes that they made a correct identification. And that is what can be so dangerous because it can sound so convincing." Likewise, during closing arguments, defense counsel stated, "Now, we're not saying this is some kind of lie also. Just to be clear, this is a good faith identification on the part of these witnesses. They honestly think, they truly think in their minds that they saw Chad Johnson."

¶ 63      A charge of mistake or inaccuracy is not sufficient to render admissible the prior consistent statements of a witness. *People v. Hayes*, 139 Ill. 2d 89, 137 (1990) (prior consistent statements of State witnesses were not properly admissible where defendant did not charge that they were motivated to falsely identify him but merely alleged that they mistakenly identified him), *overruled on other grounds by People v. Tisdel*, 201 Ill. 2d 210, 218-19 (2002); *Moore v. Anchor Organization for Health Maintenance*, 284 Ill. App. 3d 874, 885 (1996) (prior consistent statement was inadmissible where opposing party did not make any charge that testimony of witness was recently fabricated). Accordingly, since defendant in this case did not raise any charge that Desi recently fabricated his testimony or had a motive to testify falsely, but merely relied on a defense of mistaken identity, it was error to permit the State to rehabilitate Desi with his prior consistent statement.

¶ 64      Moreover, in any event, even if the defense had chosen to argue that Desi had a motive to falsely implicate defendant because of the rivalry between their respective gang factions, the State could only have introduced Desi's prior consistent statement upon showing that his statement predated the existence of such rivalry. See *Heard*, 187 Ill. 2d at 70 (prior consistent statements of defense witnesses were inadmissible where their motive to fabricate, namely, their relationship with the defendant, existed at the time of the crime before they made such statements); *House*, 377 Ill. App. 3d at 19 (prior consistent statement of defendant's brother was inadmissible where his motive to testify falsely, *i.e.*, his relationship with the defendant, predated the statement); *Terry*, 312 Ill. App. 3d at 995 (trial court abused its discretion in admitting testimony about witness's prior consistent statement where witness did not make that statement until after his alleged motive to testify falsely arose). There is no question here that the gang rivalry, as well as any motive to fabricate which might have arisen from that gang rivalry, preexisted the shooting itself.

¶ 65      The State nevertheless argues that, even if the trial court erred in admitting this testimony, such error was harmless where the evidence against defendant was overwhelming. The improper admission of evidence is harmless error if no reasonable probability exists that the verdict would have been different if the evidence at issue had been excluded (*People v. Lynn*, 388 Ill. App. 3d 272, 282 (2009)), such as where the evidence of guilt is overwhelming (*People v. Bartee*, 351 Ill. App. 3d 472, 481 (2004)). However, as has been discussed, we do not find the evidence of guilt to have been overwhelming in this case. With no physical evidence linking defendant to the crime, the jury was required to choose between conflicting eyewitness testimony: Desi and Kentrae identified defendant as the shooter they saw sitting in the front passenger seat of the car, while Joyce, Ora, and Gloria all testified that they saw

defendant in Fulton, Kentucky on that day. Thus, the credibility of these witnesses was the critical factor upon which the jury's verdict rested. Although the defense's impeachment of Desi deals with matters surrounding his identification of defendant, rather than the identification itself, it is nevertheless significant in light of the fact that Desi was one of only two witnesses who identified the defendant. Indeed, Desi was the only one who identified defendant on the day of the crime, the other witness having withheld such identification when originally questioned, and both witnesses being impeachable by reason of their rival gang affiliation. By improperly bolstering Desi's credibility, the State may well have influenced the verdict in its favor. See *Moore*, 284 Ill. App. 3d at 885 ("When, however, evidence of a prior consistent statement is highly prejudicial because it makes the testimony of a witness more believable on a critical fact in controversy and it is impossible to tell whether the jury relied upon that evidence, the statement's erroneous admission warrants reversal of the jury's verdict and an order remanding the case for a new trial."). Thus, the trial court's error in allowing Desi's testimony in this regard would arguably be independent grounds for reversal. Nevertheless, we need not rest solely upon this error in reversing, because of the errors previously discussed, namely, the trial court's lack of compliance with Rule 431(b) and the introduction of irrelevant and prejudicial testimony about defendant's incarceration for an unrelated drug offense. For all these reasons, the cause must be remanded for a new trial.

¶ 66     D. Testimony Regarding Kentrae's Prior Inconsistent Statement

¶ 67     Defendant's next contention is that the trial court erred in barring defense counsel from eliciting testimony regarding an alleged prior inconsistent statement by Kentrae on the day of the shooting.[3] Defendant sought to discredit Kentrae's identification of him based on the fact that Kentrae did not identify defendant on the day of the shooting. To this end, defendant attempted to elicit testimony from Kentrae that, when he spoke to detectives in the hospital on February 1, 2004, he merely stated that he saw a black male with a gun in the front passenger seat:

"DEFENSE COUNSEL: And you told the detectives that you saw a black male with a gun in the front window?

PROSECUTOR: Objection. That's not impeaching.

THE COURT: Sustained."

Defendant also attempted to elicit testimony on this subject from Detective Proctor, one of the detectives who interviewed Kentrae at the hospital. However, the trial court sustained State objections to this testimony as well:

"DEFENSE COUNSEL: Did [Kentrae] describe the shooter in the front window,

---

[3]In addition to urging substantive error in the judge's ruling on these matters, defendant also contends that the manner in which these rulings were articulated by the court in its colloquy with respect to one of the defense's witnesses, Detective Proctor, was prejudicial, which shall be discussed separately.

front passenger window of the car?

PROSECUTOR: Objection, not impeaching.

THE COURT: That will be sustained.

DEFENSE COUNSEL: I think–

THE COURT: Sustained.

DEFENSE COUNSEL: Did he describe the sequence of events about what happened out there when he was shot?

THE COURT: That will be sustained. Ladies and gentlemen, this testimony is not admissible, as counsel knows. So that's why I'm sustaining it.

DEFENSE COUNSEL: Did–

THE COURT: Counsel, hearsay is not admissible."

Defendant contends that the statements he was trying to elicit were admissible as impeachment. The State argues that the trial court acted within the latitude of its discretion, and, in any case, the defense had an adequate opportunity to present its theory of defense to the jury.

¶ 68      Prior inconsistent statements of a witness are generally admissible for impeachment purposes. *People v. Bueno*, 358 Ill. App. 3d 143, 156 (2005); *People v. Thomas*, 354 Ill. App. 3d 868, 877 (2004). Inconsistency can arise where a witness fails to state a particular fact under circumstances in which it would be likely that he would state such fact if true. *People v. Henry*, 47 Ill. 2d 312, 320-21 (1970) (citing John Henry Wigmore, Wigmore on Evidence § 1042 (3d ed. 1940)); see *People v. Zurita*, 295 Ill. App. 3d 1072, 1077 (1998) (witness who testified that defendant drew a gun and lifted his arm in a shooting motion could be impeached with his prior statement to police in which he did not mention defendant as the shooter). Such a material omission of fact amounts to an assertion of the nonexistence of that fact and is admissible to discredit the witness. *Henry*, 47 Ill. 2d at 321.

¶ 69      In this case, we find that the trial court erred in excluding the testimony at issue. Kentrae testified that defendant was a member of a rival gang branch whom he had known for approximately four years. Under such circumstances, if Kentrae had recognized defendant as one of the shooters, it would have been likely for him to identify defendant when questioned by detectives following the shooting. Thus, testimony that he merely described the shooter in the front passenger seat as a black male with a gun would be relevant and admissible as impeachment. *Id.*; see *Zurita*, 295 Ill. App. 3d at 1077 (where witness made statement to police in which he did not identify defendant as the shooter, but then testified at trial that defendant was the shooter, his trial testimony was not merely a " 'clarification' " of his statement to the police but was actually inconsistent).

¶ 70      The State nevertheless argues that any error in this regard was harmless, since the defense had an adequate opportunity to show the jury that Kentrae failed to identify defendant on the day of the shooting. We agree. Although Kentrae was not permitted to testify that he told detectives that he saw a black male with a gun in the front seat of the car, he was permitted to testify as follows:

"DEFENSE COUNSEL: Sir, you never told the detectives when they interviewed you

-19-

at the hospital that you saw [defendant] in the passenger seat?

KENTRAE: I don't remember telling them nothing besides it was a blue car because I was in pain at the time.

\*\*\*

Q. And, sir, you also never told the detectives that you saw [defendant] with a gun on–at the time of the shooting?

A. I only recall telling them officers that came to the hospital that it was a blue car, a four-door blue car."

This testimony was corroborated by Detective Proctor's testimony that, following his interview with Kentrae at the hospital, he was not investigating or looking for the defendant. Accordingly, notwithstanding the trial court's error in excluding the impeachment at issue, the jury was nevertheless informed, albeit with less emphasis, of the fact that Kentrae did not identify defendant as one of the shooters when he spoke to detectives at the hospital following his injury.

¶ 71                                E. Claimed Hostility Toward Defense Counsel
                                        and Defense Witness Taylor

¶ 72        Defendant finally contends that his conviction should be reversed and the cause remanded for trial before a different judge because the trial judge displayed hostility toward both defense counsel and defense witness Kimyona Taylor. In particular, defendant complains of two separate incidents. The first incident occurred during the defense's redirect examination of Kimyona Taylor, where the trial judge criticized the report prepared by Taylor's partner in the presence of the jury, and also further criticized the report as well as Taylor's job performance outside the presence of the jury. The second incident occurred during the defense's direct examination of Detective Proctor, where, in the presence of the jury, the trial judge made allegedly disparaging remarks about defense counsel while barring defense counsel from eliciting testimony from Detective Proctor regarding Kentrae's prior inconsistent statements.

¶ 73        With regard to the first incident, Taylor testified during cross-examination by the State that she did not take any notes of her interviews with the witnesses in Fulton, Kentucky, who corroborated defendant's alibi. On redirect examination by the defense, Taylor testified that her partner wrote a report containing the names of the witnesses who supported defendant's alibi. The State raised an objection to this testimony. The following dialogue then occurred in the presence of the jury:

"THE COURT: Wait a minute. You just said you didn't write a report. Your partner wrote a report?

TAYLOR: No, I did not say I did not write a report. He asked me if I had taken notes.

THE COURT: Did you write a report of what the witnesses said?

A. No, I didn't specifically, me, no, I did not write a report.

THE COURT: You did write a report?

-20-

A. Specifically, no, I did not–

THE COURT: Wait a minute. Ma'am, listen to my question. Did you write a report?

A. No, I did not.

THE COURT: Did your partner write a report?

A. Yes, she did.

THE COURT: Is that the report there?

A. This is the report that my partner wrote.

THE COURT: That's it?

A. Yes.

THE COURT: The list of the witnesses?

A. Yes.

THE COURT: And it says they confirm an alibi? *Is that it? You call that a report?*

DEFENSE COUNSEL: Judge–

THE COURT: Wait a minute. Ladies and gentlemen of the jury, step out." (Emphasis added.)

Once the jury had left, the trial judge proceeded to question Taylor about her salary, the fact that she wrote no report despite her trip being paid for by the public defender's office, and the inadequacy of the report prepared by her partner. Defense counsel then moved for a mistrial on grounds that the judge was "yelling at my witness." The court denied defense counsel's motion and further stated:

"And how you can call that a report, Mr. Stahl, with a straight face, and how a Cook County Public Defender employee can call that a report is beyond me. That borders on perjury for both of you, and you know it. And I want this transcript to go to the County Board."

¶ 74    Defendant argues that the portion of this exchange that took place before the jury was prejudicial because the court's comment ("Is that it? You call that a report?"), in context, conveyed a message to the jury that the court believed that Taylor was lying and that defendant's alibi witnesses were unworthy of belief. The State, on the other hand, argues that the court's comment in the jury's presence pertained solely to the quality of the report prepared by Taylor's partner and implied nothing about the veracity of the information contained therein, let alone the veracity of the testimony by the listed witnesses.

¶ 75    The second incident of which defendant complains occurred during the testimony of Detective Proctor, where, as has been discussed earlier, the trial court erroneously sustained a string of State objections to testimony about Kentrae's statements to Detective Proctor on the day of the shooting. In sustaining these objections, the judge also made various comments to and about counsel for the defendant that could, at least on their face, be characterized as disparaging. In particular, defendant objects to the following comments made in the presence of the jury:

"DEFENSE COUNSEL: Did [Kentrae] describe the sequence of events about what happened out there when he was shot?

-21-

THE COURT: That will be sustained. Ladies and gentlemen, this testimony is not admissible, *as counsel knows*. So that's why I'm sustaining it.

DEFENSE COUNSEL: Did–

THE COURT: Counsel, hearsay is not admissible. *** Any conversations with Kentrae Wade and this detective are inadmissible at this point. If you have any other questions about the rest of his investigation, you can certainly go into that.

DEFENSE COUNSEL: Judge, all of our witnesses today are impeachment witnesses. Is the Court's ruling we're not allowed to impeach based on the testimony?

THE COURT: *This is not impeachment, ladies and gentlemen. You'll hopefully see what impeachment is, if it comes to that.*

***

DEFENSE COUNSEL: Did Kentrae Wade tell you–

THE COURT: It will be sustained. Counsel, any statements that Kentrae Wade made to this detective–*as you stated, you are aware of hearsay*–are inadmissible. So please move on to something else." (Emphasis added.)

Defendant argues that the "unambiguous message" to the jury was that his counsel was "an unskilled and disreputable character."

¶ 76    We agree that the complained-of comments by the trial court in the presence of the jury were at least marginally inappropriate. It is well established that, because of the trial judge's great influence over the jury, the judge must take care to avoid displaying any unnecessary display of antagonism or favor toward any party. *People v. Heidorn*, 114 Ill. App. 3d 933, 936 (1983); see *People v. Lewerenz*, 24 Ill. 2d 295, 301 (1962) ("Jurors are quick to perceive any leaning of the court and place great reliance upon what he says and does, so that his statements and intimations are liable to have the force of evidence and be most damaging to an accused."). While the judge has wide discretion in the conduct of trial, the judge may not make comments that would reveal his opinion as to the credibility of a witness or the arguments of counsel. *Heidorn*, 114 Ill. App. 3d at 936; *People v. Eckert*, 194 Ill. App. 3d 667, 674 (1990) ("The trial judge must exercise a high degree of care to avoid influencing the jurors in any way, to remain impartial, and to not display prejudice or favor toward any party."); see *People v. Mitchell*, 228 Ill. App. 3d 167, 169-70 (1992) (defendant's conviction reversed where trial judge made multiple disparaging remarks toward defense evidence and theories). However, for such comments to constitute reversible error, the defendant must not only show that such comments are improper, but also that he has been thereby prejudiced. *People v. Wells*, 106 Ill. App. 3d 1077, 1086 (1982); see *Heidorn*, 114 Ill. App. 3d at 937-38 (court's improper remarks were harmless error and did not warrant reversal where, in view of the total circumstances of the case, they had no effect on the jury's verdict). The defendant bears the burden of proof to demonstrate prejudice. *Wells*, 106 Ill. App. 3d at 1086.

¶ 77    Although the majority of the judge's commentary with regard to the stated report prepared by Taylor's partner took place after the jury had been excused, the judge nevertheless asked Taylor in the presence of the jury, "That's it? *** The list of the witnesses? *** And it says they confirm an alibi? Is that it? You call that a report?" The

-22-

patent sarcasm inherent in that comment unnecessarily displayed a personal evaluation of the report's quality beyond the bounds of its technical evidentiary sufficiency. Neither side challenges the correctness of the court's evidentiary ruling that the report was inadmissible, but it was less than appropriate for the judge to personally comment, not only on the quality of the evidence, but upon the diligence of the investigator, other than to simply rule on the evidence, particularly in the presence of the jury. See *Lewerenz*, 24 Ill. 2d at 301 ("Jurors are quick to perceive any leaning of the court and place great reliance upon what he says and does, so that his statements and intimations are liable to have the force of evidence and be most damaging to an accused."); *People v. Sprinkle*, 27 Ill. 2d 398, 402 (1963) (trial judge's hostile attitude toward an accused or his witnesses is apt to influence the jury).

¶ 78    With regard to the testimony of Detective Proctor, it would appear that the judge was unnecessarily preemptive and dismissive in terminating defense counsel's repeated attempts to elicit testimony from Detective Proctor which the judge (albeit erroneously) ruled to be inadmissible hearsay. Such display of annoyance could, when viewed in the wider context of trial, potentially have served to reinforce any impression of hostility toward the defense that the jury had received from the judge's prior colloquy with Kimyona Taylor. See *Mitchell*, 228 Ill. App. 3d at 171 (even if judge's inappropriate comments would not individually be sufficient to prejudice defendant, the cumulative impact of such comments must be considered).

¶ 79    Since we are reversing this case because of the trial court's lack of compliance with Rule 431(b), the admission of irrelevant and prejudicial evidence regarding the defendant's prior drug conviction, and the erroneous bolstering of Desi's trial testimony with his prior consistent statements, we need not determine whether these complained-of judicial comments are, in and of themselves, sufficient to require reversal. However, we note that such comments must be measured and controlled to maintain a climate and appearance of dignity and neutrality, particularly in the presence of the jury, and even more particularly where the evidence is closely balanced. As has been explained:

> "Our appellate courts will permit a limited amount of impatience, but the closer the case, the more partial or biased the remarks will appear, and the greater the total effect of [the judge's] conduct, the more likely that the case will be reversed on appeal, particularly if there is other error in the record that is close to being reversible error in and of itself." 1 Robert S. Hunter, Trial Handbook for Illinois Lawyers–Criminal § 3:19 (8th ed. 2002).

As previously discussed, the outcome of this case turned upon the credibility of the State's occurrence witnesses versus the credibility of the defendant's alibi witnesses. Under such circumstances, it is arguable that the trial court's casting of aspersions upon the defense–and, in particular, the defense investigator who found the alibi witnesses whose testimony was critical to the defense–might well have influenced the jury in reaching its verdict.

¶ 80    Moreover, as already indicated, the need for judicial restraint in the court's conduct and remarks is not limited to the presence of the jury but must be maintained throughout all of its dealings with the litigants who come before it. Although defendant does not choose to emphasize this point in his brief, we cannot overlook the fact that the trial court's comments to Kimyona Taylor, albeit outside the presence of the jury, were also inappropriate.

Regardless of whether the judge's extended critique of the investigation and the quality of Gutierrez's report may have had substantive merit, such extended critique should best be avoided in the context of an ongoing trial. See *Eckert*, 194 Ill. App. 3d at 674, in which the court stated:

> "The Code of Judicial Conduct prescribes that a judge should be patient, dignified, and courteous to litigants, jurors and witnesses, lawyers and others with whom he deals in his official capacity. [Citation.] Likewise, the A.B.A. Project on Minimum Standards for Criminal Justice, Standard 6-3.4, provides that 'when it becomes necessary during the trial for the judge to comment upon the conduct of witnesses, spectators, counsel or others, or upon the testimony, the judge should do so in a firm, dignified, and restrained manner, avoiding repartee, limiting comments and rulings to what is reasonably required for the underlying progress of the trial, and refraining from unnecessary disparagement of persons or issues.' "

Thus, in *People v. Phuong*, 287 Ill. App. 3d 988, 994 (1997), the trial court reversed a defendant's conviction where, during a bench trial, the trial judge made numerous disparaging comments about the defendant, a defense witness, and defense counsel. In issuing its ruling, the *Phuong* court rejected the proposition that such comments were harmless since they were uttered outside the presence of any jury:

> "The State also insists that the trial court's comments do not demonstrate error since there was no jury present to be influenced by their utterances. However, the State is clearly oblivious of the high standard to which judges are held. Judges are required to be fair and dispassionate arbitrators above all else." *Id.* at 994.

¶ 81      In this case, the judge's comments toward Kimyona Taylor and defense counsel outside the presence of the jury were not " 'reasonably required for the underlying progress of the trial' " (*Eckert*, 194 Ill. App. 3d at 674), insofar as they related to the collateral issue of Taylor's job performance as an employee of the public defender's office. Nor were they made in a " 'firm, dignified, and restrained manner' " (*Eckert*, 194 Ill. App. 3d at 674), nor were they "dispassionate" (*Phuong*, 287 Ill. App. 3d at 994).

¶ 82      In any event, as has been discussed, we need not decide whether the trial court's comments, in and of themselves, would be sufficient to require reversal, because we are already reversing on other grounds. However, although we have no reason to doubt or question the integrity, good faith, and overall ability and competence of the trial judge, we believe that in this case, it would be best for both the court and the parties if the trial on remand were to take place before a different judge.

¶ 83      Thus, for the foregoing reasons, we reverse and remand for a new trial before a different judge.

¶ 84      Reversed and remanded, with instructions.